**E. J. SHAILER, Petitioner,**

v.

**UNITED STATES of America,**
**Respondent.**

**Civ. No. 496.**

United States District Court
E. D. North Carolina,
Elizabeth City Division.

June 9, 1965.

E. J. Shailer, pro se.

Robert H. Cowen, U. S. Atty., by John R. Hooten, Asst. U. S. Atty., for respondent.

LARKINS, District Judge.

## SUMMARY

This cause comes before the Court upon a "MOTION FOR LEAVE TO FILE PETITION TO VACATE AND SET ASIDE SENTENCE, AND, LEAVE TO FILE, PROSECUTE AND PROCEED IN FORMA PAUPERIS", filed July 16, 1964, pursuant to the provisions of Title 28 U.S.C.A. § 2255. Respondent answered the petition and joined issues whereupon petitioner proceeded on a course of filing numerous supplements, amendments and other related motions, all since the time respondent made its original Answer and Motion to Dismiss in which the principal issue was joined.

Petitioner's principal issue put before this Court by these numerous documents is that:

"petitioner was psychotic and mentally incompetent during and after his trial and when sentence was imposed upon him in this Court on May 11, 1964, * * * that he was and is incapable at times from distinguishing right from wrong, * * * that his will and governing power of mind was, and is, completely destroyed and deranged and were so at the commission of crime as well as at trial; * * *" (pp. 8 & 9 of original Petition.)

## FINDINGS OF FACTS

Petitioner was sentenced to a period of incarceration of three (3) years in the United States Prison System on May 11, 1964 under the provisions of Title 18 U.S.C.A. § 4208(a) (2). This sentence was imposed upon his plea of guilty to the offense of transporting in interstate commerce a stolen motor vehicle, in violation of Title 18 U.S.C.A. § 2312.

Petitioner was provided assistance of counsel prior to his arraignment and plea, as well as at the time judgment was pronounced.

Petitioner avers in his affidavit accompanying his first petition, as well as in other documents which he has subsequently filed, facts relating to a period in his life which occurred immediately after the termination of World War I, and the year 1919. These averments concern his periods of service in branches in the United States Military, as well as other matters which might have some bearing on the question at hand; therefore, this Court will make a brief sketch of petitioner's life history.

He was born in September 1903 in Milford, Connecticut. (There is some evidence that petitioner was actually born in Fort Worth, Texas in the year 1900. These factual discrepancies characterize the record and appear frequently. The Court will select that which appears most plausible in light of the entire record without giving reasons for resolving these factual conflicts because such determinations are not material to the determination of the basic issue raised by the petition.)

Petitioner's father was a Methodist minister and was in the pursuit of his chosen profession in the State of Texas when he died in 1907. Petitioner was very young at that time.

Petitioner and his mother, who was a seamstress, then traveled to Connecticut, the maternal grandparents' home, where his mother could work and where they could live. The mother never remarried and the two apparently remained in the home of the maternal grandparents, although there is no direct evidence as to where they actually lived during the ten years following the death of petitioner's father. Petitioner was difficult to manage during this period although he was the only child.

In petitioner's thirteenth year he was sent to a military or training school in Connecticut (either Kent Military Academy or Litchfield Boys' School). He was promptly introduced to homosexuality at this school and practiced it regularly for years thereafter.

Petitioner's academic progress was apparently satisfactory while in the school, but he did not graduate. On August 11, 1919, at the age of sixteen (16) years, he enlisted in the United States Army under the name of George W. Ringling. Shortly afterward, on October 12, 1919, petitioner received a dishonorable discharge for psychoneurosis, hysteria and constitutional psychopathy.

Petitioner maintains that, while on guard duty, he was hit on the head and received institutional treatment as a result of this blow. He has referred to this condition as "shell shock". At any rate, he was hospitalized and treated in Veterans' Administration Hospitals intermittently over a two and one-half to three year period after discharge from the Army.

After recovery, petitioner enlisted in the United States Navy in July 1922. He served for approximately one year, being discharged with an undesirable discharge on June 20, 1923, because he was determined unfit for military service.

He was again admitted to a Veterans' Administration Hospital upon this second discharge and remained therein for five months, being released in November 1923. Petitioner immediately stole an automobile, was caught shortly thereafter, tried, sentenced and imprisoned. The record indicates a total of thirty-four years of imprisonment have since been served by petitioner from the time of this original arrest and sentencing in November 1923, to the time of this last prison report of April 1965.

The offenses range from forgery to interstate transportation of stolen motor vehicles, and bad check violations to acts of sodomy with children.

Petitioner's marital career shows an equally disastrous encounter with society. He has been married three times, the first taking place in 1927 with a sixteen year old girl. Petitioner maintains that this was a happy union and that his wife and child were killed in 1932 in Texas as a result of a train-automobile collision. There is evidence to the contrary, however, and which indicates that the union did not last an entire year.

Petitioner's second marriage ended in 1952 upon the death of the wife, while petitioner was in prison. At the time of his imprisonment in 1951, he did not know the whereabouts of this wife. They were married in 1949, the day after petitioner was released from prison.

The last marriage ended in divorce in December 1964. Petitioner married this third wife in 1958, the day following his release from prison also.

Petitioner blames much of his present difficulty on this third marriage, insisting that his wife and a local preacher would read the Bible to him in the morning and curse and swear at him at night. This conduct, petitioner claims, led him to drink and ultimately to escape from them.

The marriage to the third wife has now ended in divorce, obtained by the wife on the grounds of sexual impotency— these grounds being vigorously denied by petitioner.

Petitioner does admit to being a sexual deviate and to have practiced homosexuality, but not in recent times. He will not initiate the discussions of his sexual deviations, however, but must be closely questioned about such matters before he will discuss them freely.

His homosexual traits indicate a leaning toward young men, and he has confessed to having feelings, dreams or thoughts about unusual and sometimes violent relations with children.

In relation to the events leading up to his arrest and trial, which is now brought directly in question by virtue of the present petition, the following facts appear

from the record, affidavits, Petition and Answer of the respondent.

Petitioner states that after putting up with the abuse of his third wife he felt a violence building up in him. He felt a desire to get away, to get even; a need for a new life. He admits to have been drinking at this time.

Petitioner, in order to effectuate his desire to get away, "purchased" a 1963 Dodge sedan from a Beaumont, Texas firm on February 29, 1964, with a bad check. He then traveled through the Mid-West and New England before arriving in Elizabeth City, North Carolina.

While there, petitioner represented himself to be a big ranch owner looking for retirement areas. He was well received by certain city officials until bad checks he had been writing came to light. He was arrested on March 18, 1964, and was confined in lieu of $5,000.00 bond.

He was confined in the Wake County Jail awaiting arraignment and trial and there contacted a United States Probation Officer. While being interviewed by this official, petitioner requested the assistance of counsel as an indigent and a psychiatric examination to determine his sanity at the time of the commission of the offenses charged to which he had freely and readily admitted.

Petitioner was advised that the Probation Office in Raleigh did not have facilities available to determine sanity but that petitioner should advise the Court of his feelings on both these matters at the time of arraignment.

It is to be noted that petitioner did not contend he was too incompetent to stand trial, or that he was insane at the time of the interview. He only insisted that he was too incompetent to commit a crime at the time he committed the offenses charged.

On May 7, 1964, petitioner had the presence of mind to write this Court advising it of a desire to obtain the services of counsel, but he did not advise the Court of any question of insanity.

On May 11, 1964, petitioner's case was called for arraignment in mid-morning, and counsel was then appointed. Counsel states that a conference of about thirty minutes then ensued. He insists that the conference was unhurried and free from interruption or pressure. He advises the Court that petitioner was not arraigned and tried until the afternoon, after the lunch recess.

Counsel for petitioner further states by way of affidavit:

"Mr. Shailer appeared to be calm, intelligent, cooperative and in complete control of his mental faculties. He stressed his poor physical condition, but he did not appear to be in any physical distress or have any illness at the time. Unquestionably, I considered him then a sane person. Although I am not a psychologist or psychiatrist, I have seen numerous persons acting with abnormal behavior, and Mr. Shailer did not possess any of these characteristics at the time I consulted with him."

That afternoon, petitioner, through his counsel, was arraigned and convicted upon his plea of guilty. He did not make any mention of insanity and gave no indication to the Court or his counsel of any need to inquire into the matter. This is so in spite of the fact that he was advised to make this issue known to the Court and he had ample opportunity to do so when conferring with his court-appointed counsel, or while actually before the Court. He was afforded his right of allocution. It is to be remembered that petitioner has had previous experience before various Courts.

On July 13, 1964, petitioner filed the first of his many documents, all alleging insanity as a grounds for vacating judgment.

Not satisfied with the record, petition, affidavits and answer in order to make a determination, the Court ordered the Director of the Bureau of Prisons to have the petitioner examined as to his mental competency at the time of the commission

of the crime (on or about February 29, 1964), and at the time of trial. These reports are now before the Court.

Petitioner was first observed and examined at the Federal Prison in Atlanta, Georgia. The gist of that report, dated November 9, 1964, is that petitioner has "consciously exaggerated" his mental difficulties in order to effect the setting aside of his present criminal sentence. The opinion was expressed that petitioner was not psychotic when sentenced and committed to the prison in Atlanta in May 1964, and "that he was not psychotic several months previously * * *."

Petitioner was transferred to the United States Medical Center, Springfield, Missouri, however, where he is now incarcerated, due to his condition as a sexual deviate.

Before proceeding, therefore, the Court determined to await a report from that latter institution and an Order was issued on December 4, 1964, holding petitioner's proceedings in abeyance until this report was forthcoming.

This report, dated April 5, 1965, states "no indication for psychotic behavior". It was the opinion of the Staff Psychiatrist that petitioner was trying to take advantage of his prior medical history and the blow on his head in the year 1919 to effectuate a release. The report confirms the prior Atlanta report.

## CONCLUSIONS OF LAW

In light of the detailed medical and psychiatric history presented to this Court, and in light of the expert evidence submitted in relation thereto, it cannot be of any benefit to petitioner or the Court to hold a hearing on the question of petitioner's mental competency at the time of the commission of the crime charged, or at the time of his trial. No issue of fact concerning mental competency, therefore, remains. U. S. v. McNichols, 298 F.2d 914 (4th Cir., 1962).

## ORDER

Therefore, it is ordered that the Motion to Vacate and Set Aside Sentence be, and the same is hereby denied.